IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MICKEY RAY JAMES                    )
                                    )
v.                                  )        No. 2:11-0012
                                    )
MICHAEL J. ASTRUE,                  )
        Commissioner of Social Security   )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) should be denied.

# I. INTRODUCTION

The plaintiff filed applications for SSI and DIB on February 17, 2009 (tr. 103-12), alleging a disability onset date of December 31, 2002, due to back pain, right knee pain, hand pain,[1] bi-polar disorder, depression, a "suicide attempt," and a history of substance abuse. (Tr. 133, 148, 150.) His applications were denied initially and upon reconsideration. (Tr. 46-55, 59-65.) A hearing before Administrative Law Judge ("ALJ") K. Dickson Grissom was held on April 20, 2010. (Tr. 27-41.) The ALJ delivered an unfavorable decision on May 18, 2010 (tr. 14-22), and the plaintiff sought review by the Appeals Council. (Tr. 10.) On November 27, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on January 17, 1974, and was 28 years old as of December 31, 2002, his alleged onset date. (Tr. 44.) He completed the tenth grade (tr. 138) and had worked as a construction worker and laborer. (Tr. 134, 152.) The plaintiff's date last insured for DIB is December 31, 2007. (Tr. 43.)

---

[1] In his response to interrogatories, the plaintiff specified that he had "constant" knee, back, and hand pain, and that his hand pain began in December 2010, after he had broken bones in his right hand. (Tr. 328.) The December 2010 date cannot be correct since the plaintiff signed the responses to the interrogatories on April 1, 2010. The ALJ also noted that the plaintiff reported having fractured bones in his right hand in December of 2010 (tr. 19), without noting that December 2010 was after the ALJ"s decision on May 18, 2010.

**A. Chronological Background: Procedural Developments and Medical Records**

Between 2001 and 2002, Dr. Bowdoin Smith, D.O., examined the plaintiff on multiple occasions; diagnosed him with insomnia, anxiety, right knee pain, and back pain; and prescribed Xanax, Altace, Percocet, Celexa, Vistaril, and Naprelan.[2] (Tr. 186-89.) In May of 2002, the plaintiff presented to the Emergency Room at the Cookeville Regional Medical Center ("CRMC") after injuring his right knee and hip in a "four wheeler accident." (Tr. 319-22.) An MRI and x-ray of the plaintiff's right knee revealed a fracture of the tibia and x-rays of his right ankle, right hip, and pelvis were normal. (Tr. 192, 322.) On June 14, 2002, the plaintiff underwent arthroscopic surgery on his right knee (tr. 297-301) and in November of 2002, he was discharged from physical therapy after achieving his "Long Term Goals." (Tr. 304.)

On September 17, 2008, the plaintiff was admitted to Austin State Hospital ("ASH"), in Austin, TX, for suicidal ideation (tr. 196-98), and he reported that he was living in a tent on his mother's property, that he drinks beer and smokes marijuana "as often as he can get it," and that he has a family history of bipolar disorder. (Tr. 196-97.) Dr. Lyman Phillips noted that the plaintiff had strong work skills, survival skills, verbal skills, and physical health, and poor interpersonal and coping skills. (Tr. 197.) Dr. Phillips diagnosed the plaintiff with depressive disorder, not otherwise specified ("NOS"), and "alcohol and THC use;" prescribed Risperdal, Atarax, and Trazodone;[3] and

_____

[2] Xanax is a sedative used to treat panic disorders and agoraphobia; Altace is prescribed to prevent a heart attack or stroke; Percocet is a pain reliever; Celexa is a "selective serotonin reuptake inhibitor (SSRI)" used to treat major depression; Vistaril is a minor tranquilizer; and Naprelan is a nonsteroidal anti-inflammatory (NSAID) used to treat mild to moderate pain. Saunders Pharmaceutical Word Book 33-34, 141, 479, 546, 758, 768 (2009) ("Saunders").

[3] Risperdal is prescribed for schizophrenia and manic episodes of a bipolar disorder; Atarax is a minor tranquilizer; and Trazodone is a selective serotonin re-uptake inhibitor used to treat depression, panic attacks, and anxiety. Saunders at 68, 618, 716.

assigned the plaintiff a GAF score of 25.[4] (Tr. 198.) While at ASH in September and October of 2008, the plaintiff reported being angry and having mood swings, racing thoughts, anxiety, panic attacks, suicidal ideation, and paranoid ideation; was diagnosed with bipolar disorder, NOS, depression, psychotic symptoms, mood instability, and anxiety; and was prescribed Risperdal, Celexa, Trazodone, Atarax, Buspar, and Lithium.[5] (Tr. 215, 217, 219, 221, 223, 227, 229.) On October 19, 2008, the plaintiff was discharged from ASH and he reported having anxiety and paranoid ideation but also "good mood, sleep, and appetite," and it was noted that his condition had improved and that he had "gained the maximal benefit from hospital stay and is ready for a safe re-entry to the community." (Tr. 204.) The plaintiff was diagnosed with bipolar disorder and depression and was assigned a GAF score of 50.[6] *Id.*

Between October 10, 2008, and January 23, 2009, the plaintiff received outpatient therapy and counseling and medication management from Central Counties MHMR Authority ("MHMR") in Temple, Texas. (Tr. 340-402.) At intake, he reported having suicidal ideation, an "inability to focus and concentrate . . . [and] to be around groups of people," sleeplessness, and racing thoughts,

---

[4] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 21-30 means that the plaintiff's "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends." *Id.*

[5] Buspar is used to treat anxiety and Lithium is used to treat manic episodes. Saunders at 116, 410.

[6] A GAF score within the range of 41-50 means that the plaintiff has "[s]erious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

and being depressed. (Tr. 399.) The plaintiff was diagnosed with bipolar disorder that was described as "severe with psychosis," polysubstance dependence, insomnia, and back and knee pain; was assigned GAF scores of 45; and was prescribed Risperdal, Trazodone, and Vistaril. (Tr. 341, 344, 346, 356, 358, 361-62, 387, 400.) During his treatment, it was noted that he was "somewhat improved," "appeared to be doing well," and "seems to be functioning on the present medication," (tr. 361, 377, 390) and that he reported that he was "doing well" (tr. 368), was "good" (tr. 373), and was "feeling 'fine'" (tr. 377) but was anxious "at the possibility of not getting his medication." (Tr. 380.)

On November 20, 2008, after returning to Tennessee, the plaintiff presented to Volunteer Behavioral Health Care System (VBHCS), upon referral from MHMR, with complaints of past suicidal ideation, depression, and polysubstance abuse. (Tr. 238.) It was noted that the plaintiff's polysubstance abuse mildly impacted his employment, moderately impacted his physical health and interpersonal relationships, and severely impacted his community living skills; that his affect was blunted, behavior was appropriate, mood was depressed, psychomotor was appropriate, and concentration was fair; and that he was "at low risk to self and others." (Tr. 240-41.) He was diagnosed with alcohol dependence, bipolar disorder, and depression; assigned a GAF score of 55;[7] and prescribed Risperdal, Trazodone, Neurontin,[8] and Lithium. (Tr. 241-42.)

---

[7] A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

[8] Neurontin is an anticonvulsant. Saunders at 488.

The plaintiff returned to VBHCS in December of 2008, and in January of 2009, and related that he had stopped taking Risperdal because it made his "skin crawl" and had "marked anxiety," and a depressed mood, but no current suicidal ideation and was sleeping better. (Tr. 234-37.) He was diagnosed with alcohol dependence, bipolar disorder, and depression; assigned a GAF score of 55; and prescribed Lithium, Risperdal, Seroquel,[9] and Trazodone. *Id.* In February of 2009, the plaintiff presented to VBHCS and reported that "his mood has been good and stable," that he had back and knee pain, and that his medication did not need to be adjusted. (Tr. 264.) He was diagnosed with bipolar disorder, moderate depression, and alcohol dependence; assigned a GAF score of 55; and prescribed Lithium and Seroquel. (Tr. 265.)

On March 10, 2009, Dr. Cal VanderPlate, Ph.D., a nonexamining Disability Determination Services ("DDS") consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 243-56) and diagnosed the plaintiff with bipolar disorder that was "stable and controlled [with treatment]" and alcohol dependence. (Tr. 246, 251.) He concluded that the plaintiff had moderate restriction of activities of daily living; moderate difficulties maintaining social

---

[9] Seroquel is used to treat bipolar disorder and schizophrenia. Physicians Desk Reference 735 (65th ed. 2011) ("PDR").

functioning, concentration, persistence, or pace; and one or two episodes of decompensation.[10]

(Tr. 253.)

Dr. VanderPlate also completed a mental Residual Functional Capacity ("RFC") assessment and opined that the plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; in his "ability to maintain attention and concentration for extended periods;" in his "ability to work in coordination with or proximity to others without being distracted by them;" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in his "ability to interact appropriately with the general public;" in his "ability to accept instructions and respond appropriately to criticism from supervisors;" in his

---

[10] The regulations define episodes of decompensation as
exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4 (emphasis in original).

"ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and in his "ability to respond appropriately to changes in the work setting." (Tr. 257-58.)

On April 15, 2009, the plaintiff presented to Dr. Jerry Lee Surber, a consultative DDS physician, for "range of motion testing of his back and his worse knee." (Tr. 261.) The plaintiff related that his back pain was "variable," that he did not have any back pain at that time, and that he did not have hand pain but that he did have right knee pain. *Id.* Dr. Surber noted that the plaintiff did not use an assistive device, that he had no tenderness in his back, that his "right knee was palpably unstable," and that he had a limping gait. (Tr. 261-62.) Dr. Surber found that the plaintiff had no pain or mobility limitations in his back and that his right knee pain was consistent with "either [an] anterior or [a] postanterior cruciate ligament tear or [a] partial tear." (Tr. 262.)

In May of 2009, the plaintiff returned to VBHCS and reported that "his mood has been good and he has had no problems or [symptoms] of Axis I pathology." (Tr. 266.) It was noted that the plaintiff was "doing well" on his current medications and he was diagnosed with bipolar disorder, moderate depression, and alcohol dependence; assigned a GAF score of 55; and prescribed Lithium and Seroquel. (Tr. 267.)

On May 8, 2009, Dr. Kanika Chaudhuri, a nonexamining consultative DDS physician, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 268-76) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, that in an eight hour workday he could sit or stand for about six hours, and that his ability to push/pull was limited in his lower extremities. (Tr. 269.) She also found that the plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and could occasionally climb ladders, ropes, or scaffolding. (Tr. 270.)

The plaintiff presented to VBHCS in September and December of 2009 (Tr. 284-90), and related that he had not "seen a provider in five months," that he "drinks 'like a case every few days or so,'" that drinking is "'the only thing that helps me'" and it enables him to be around people, that he has ongoing panic attacks, that he had "passive" suicidal ideation, that Seroquel helps him to sleep, that Lithium "'keeps me level headed . . . I dont [sic] have a manic phase or a depressed phase on it,'" and that "he 'used to take celexa with the xanax-- and that worked good for six years.'" (Tr. 284, 288.) He was diagnosed with bipolar disorder, moderate depression, and alcohol dependence; assigned a GAF score of 50; and prescribed Lithium and Seroquel. (Tr. 285, 288.) It was also noted that the plaintiff's "main priority should be to get sober though he is resitant [sic] to this." (Tr. 285.) On December 3, 2009, a Tennessee Clinically Related Group ("CRG") assessment indicated that the plaintiff's activities of daily living; interpersonal functioning; and concentration, task performance, and pace were moderately limited and that his ability to adapt to change was mildly limited. (Tr. 280-81.) He was assigned a GAF score of 50 and was classified as a person who was "Formerly Severely Impaired."[11] (Tr. 282.)

On March 22, 2010, the plaintiff presented to Jeffrey Scott Herman, M.A., a consultative psychological examiner, for a psychological evaluation and related that he is not able to work due to panic attacks, that "'people were out to get me for some damn reason,'" that Seroquel helps him sleep, that he used to drink heavily but now only drinks "about once or twice a month," that he no longer smokes marijuana, that he has unusual visual experiences and thinks he sees ghosts, and that he has racing thoughts. (Tr. 307-10.) Mr. Herman diagnosed the plaintiff with psychotic disorder,

_____

[11] A person who is "Formerly Severely Impaired is "not recently severely impaired but [has] been severely impaired in the past and need[s] services to prevent relapse." (Tr. 282.)

NOS, polysubstance disorder, "R/O [rule out] Bipolar Disorder with Psychotic Features," and "R/O Schizophrenia, Paranoid Type," and assigned him a GAF score of 34.[12] (Tr. 311.)  He found that the plaintiff "is capable of understanding and remembering instructions of a simple and repetitive nature. . . [but] is not suited to detailed work or tasks requiring complex decisions," that he was markedly impaired in his "ability to sustain concentration and persistence" and in his social functioning, that "even though he held a job successfully in the past, it is likely that his father was shielding him from interpersonal problems," that his paranoid ideation "make[s] him unable to function in most settings" and "could pose a foreseeable threat in the workplace," that he is unable to manage "any awarded funds," and that he does not have a driver's license. (Tr. 311-12.)

On March 25, 2010, the plaintiff presented to the Jackson County Health Department because he needed medication. (Tr. 338-39.)  It was noted that the plaintiff appeared anxious and he was diagnosed with hypertension, tobacco dependence, bronchitis, and prescription drug abuse, and was prescribed a Z-pak, Metoprolol,[13] and Ibuprofen. *Id.*

On April 6, 2010, Mr. Herman reviewed the plaintiff's clinical records from VBHCS[14] and submitted an addendum to his March 22, 2010, psychological evaluation. (Tr. 337.)  Mr. Herman

_____

[12] A GAF score within the range of 31-40 means that the plaintiff has "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

[13] Z-Pak, also known as Zithromax, is an antibiotic, and Metoprolol is used to treat high blood pressure and chest pain. Saunders at 448, 778.

[14] Mr. Herman noted that he reviewed the plaintiff's clinical records from Plateau Mental Health Center ("PMHC").  PMHC is a division of VBHCS. (Tr. 284, 337.)

diagnosed the plaintiff with polysubstance dependence that was "in remission per [the plaintiff]" and bipolar disorder with psychotic features and assigned him a GAF score of 34.

### B. Interrogatories

On April 1, 2010, the plaintiff submitted answers to a series of interrogatories from the Social Security Administration ("SSA"). (Tr. 326-34.)  He related that he is not able to work due to "[n]erves and pain in my knee[,] back[, and] hands;" that he takes Ibuprofen for his physical pain but that it is "[n]ot effective;" that he takes Lithium, Seroquel, and Celexa but that he had side effects of jerking and muscle spasms from those medications; and that he does not use an assistive device to get around. (Tr. 327-30.)  The plaintiff reported that he is only able to walk 10-15 minutes and stand 10 minutes before he has to sit or lie down; that in an eight hour day he is able to stand/walk for one hour and sit for four hours; that he lies down for "most of the day;" that he is able to lift eight pounds with his left hand; that he does not drive, shop, attend religious or family events, participate in social organizations, exercise, or perform yard work; and that he is able to cooks simple meals, wash dishes, and vacuum. (Tr. 330-33.)

### C. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Anne Thomas, a vocational expert ("VE"), testified. (Tr. 27-41.)  The plaintiff testified that he completed either the tenth or eleventh grade, that he is not able to work or go to the grocery store because he has panic attacks when he is around people, that he does not have a driver's license, and

that he is being treated for psychological problems and pain. (Tr. 30-33.) He explained that he takes prescription strength Ibuprofen for his knee, back, and hand pain but that it makes him nauseous; that he takes Lithium, Celexa, and Seroquel for his psychological impairments; and that he occasionally uses marijuana and drinks "[m]aybe about a week out of a month all together." (Tr. 34, 36.)

The VE, consistent with the Dictionary of Occupational Titles, classified the plaintiff's past relevant work as a construction worker as heavy and semi-skilled. (Tr. 39.) The ALJ then asked the VE to consider what work the plaintiff could perform if he were limited to medium work with no exposure to dangerous and moving machinery or climbing of ladders, ropes, or scaffolds; with "simple repetitive, non-detailed tasks where co-workers or public contact would be no more than casual and frequent supervision should be direct and non-confrontational;" and with infrequent and gradual changes in the work place. *Id.* The VE answered that the plaintiff could not perform his past relevant work but concluded that he could perform medium and unskilled level work as a production laborer, hand packer, and kitchen helper. (Tr. 40.) The VE testified that a person with mild to moderate pain could perform those jobs but that an individual with severe pain or who was not able "to work eight hours a day, five days a week on a regular basis" would be precluded from working. *Id.*

The ALJ next asked the VE to consider what work the plaintiff could perform if he "were limited to the medium work with the physical restrictions of no climbing ropes, ladders or scaffolds;" were limited to simple tasks; has marked ability "to sustain concentration and persistence;" "gets off task easily and is easily distracted by his emotion;" "has a marked impairment in social functioning;" "is agitated when he's asked to perform any task;" and is "unable to relate

to his peers and supervisors." (Tr. 41.)  The VE answered that the plaintiff would be precluded from performing any work. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on May 18, 2010. (Tr. 14-22.)  Based on the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2.    The claimant has not engaged in substantial gainful activity since December 31,2002, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

* * *

3.    The claimant has the following combination of severe impairments: right knee pain status post surgery, right hand pain status post fracture, polysubstance abuse, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

* * *

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he would be precluded from climbing any ladders, ropes, or scaffolds; he would be precluded from working around hazards such as dangerous and moving machinery; he would be restricted to performing simple, repetitive, and non-detailed tasks; his interaction with coworkers and the public must be casual and infrequent; he must receive direct and non-confrontational supervision; changes in the workplace would need to be infrequent and gradually introduced; and he would experience pain from a mild to moderate level.

* * *

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.     The claimant was born on January 17,1974 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

* * *

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-22.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only

questions before this Court are whether the decision of the Commissioner is supported by substantial

evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. Sept. 24, 2004).  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case,

the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 21-22.) At step one, the ALJ found that the plaintiff demonstrated that he had not engaged in substantial gainful activity since December 31, 2002, the alleged disability onset date. (Tr. 16.) At step two, the ALJ determined that the plaintiff's "right knee pain status post surgery, right hand pain status post fracture, polysubstance abuse, anxiety and depression" were severe impairments. *Id*. At

step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.) At step four, the ALJ determined that the plaintiff could not perform his past relevant work but that

> he would be precluded from climbing any ladders, ropes, or scaffolds; he would be precluded from working around hazards such as dangerous and moving machinery; he would be restricted to performing simple, repetitive, and non-detailed tasks; his interaction with coworkers and the public must be casual and infrequent; he must receive direct and non-confrontational supervision; changes in the workplace would need to be infrequent and gradually introduced; and he would experience pain from a mild to moderate level.

(Tr. 18.) At step five, the ALJ found that the plaintiff's RFC allowed him to perform work as a production laborer, hand packer, and kitchen helper. (Tr. 22.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in rejecting Mr. Herman's psychological evaluation and failed to properly evaluate his subjective complaints of pain. Docket Entry No. 16, at 10-13.

### 1. The ALJ properly considered Mr. Herman's findings.

The plaintiff contends that the ALJ "failed to set forth good cause for his rejection of [Mr. Herman's psychological evaluation]." Docket Entry No. 16, at 10-11.

According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source

is "a physician, psychologist, or other acceptable medical source[15] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996);

---

[15] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Clearly, Mr. Herman is not a treating source.

Although neither the plaintiff nor the Commissioner raised the issue, and the ALJ did not address what type of source Mr. Herman was, it must be determined whether he is an "acceptable" nontreating source.  The record indicates that Mr. Herman is a psychological examiner who has a master's degree (tr. 307), and even assuming that he is a Licensed Professional Counselor ("LPC"), he is not an "acceptable medical source" but rather he is an "other source."[16] *See Bates v. Comm'r of Soc. Sec.*, 2011 WL 1565532, at *2 (E.D. Mich. Apr. 25, 2011) (A LPC is not an "acceptable medical source."); *Stigall v. Astrue*, 2011 WL 65886, at *5 (E.D. Ky. Jan. 10, 2011) ("20 C.F.R. § 1513(a) lists the categories of medical professionals who are considered 'acceptable medical sources.'  Counselors, even licensed professional counselors, are not listed. Numerous courts have affirmed the rule that counselors are not 'acceptable medical sources.'").

Social Security Ruling ("SSR") 06-03p explains that

> [t]he distinction between "acceptable medical sources" and other health care providers who are "not acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence

---

[16] The Regulations define other sources as
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).
20 C.F.R. § 404.1513(d).

of a medically determinable impairment.  Second, only "acceptable medical sources" can give us medical opinions.  Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *2 (internal citations omitted).  Although the treating physician rule is not applicable to Mr. Herman, since he is an "other source" and not an "acceptable medical source," SSR 06-03p notes that

> [the] Regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources;" however they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 CFR 404.1513(d) and 416.913(d).  With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

2006 WL 2329939, at *3 (quoted in *Cruse*, 502 F.3d at 541); *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)).

SSR 06-03p further clarifies the treatment of "other sources" by explaining that

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5 (quoted in *Roberts v. Astrue*, 2009 WL 1651523, at 7 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06-03p provides that

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. *Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.* In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

2006 WL 2329939, at *6 (emphasis added).

The SSA acknowledges that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain," but it is difficult to discern what that distinction is since, in the same sentence, the SSA provides that "the adjudicator generally should explain the weight given to opinions from these 'other sources.'" *Id.* According to *Merriam Webster's Collegiate Dictionary*, "consider" means "to think about carefully" or "to take into account," while explain means "to make known," "to make plain or understandable," or "to give the reason for or cause of." Merriam Webster's Collegiate Dictionary 246, 409 (10th ed. 1993) ("Webster's"). Thus,

"considering" is an introspective act and the precursor to the more overt act of "explaining," which requires the additional step of furnishing a rationale.

In *Cruse*, the Sixth Circuit held that "[f]ollowing SSR 06-03P, the ALJ should have discussed the factors relating to his treatment [of a nurse practitioner's] assessment, so as to have provided some basis for why he was rejecting the opinion." 502 F.3d at 541. The nurse practitioner completed a functional assessment and concluded that the plaintiff was unable to work but the ALJ discounted that evaluation because "'[she] is neither a medical doctor nor a vocational expert, and thus lacks the credentials for making such a determination.'" *Id.* The Court disagreed with the ALJ's determination since the ALJ's reasoning, in and of itself, "was devoid of any degree of specific consideration." *Id.* Although SSR 06-03p was not outcome determinative in *Cruse*, the Court held that an adjudicator should use the factors in SSR 06-03p to evaluate the opinions of other sources. *Id.*

The interpretations of SSR 06-03p by two District Courts, however, have contributed to the confusion surrounding the level of attention that an ALJ must devote to the opinions of other sources. The Court in *Hatfield v. Comm'r Soc. Sec.*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008), concluded that the Sixth Circuit in *Cruse* interpreted the phrase "'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion," while the Court in *Hickox v. Comm'r of Soc. Sec.*, 2010 WL 3385528, at *7 (W.D. Mich. Aug. 2, 2010) (quoting *Smith v. Comm'r of Soc. Sec.*, 2010 WL 1640271, at *4 (E.D. Va. April 22, 2010),[17] determined that SSR 06-3p "'is not written in imperative

---

[17] The District Court in *Hickox* vacated its order adopting the Magistrate Judge's Report and Recommendation after the plaintiff filed a motion requesting additional time to file his objections to the Report and Recommendation since he never received electronic service of the Report and

form'" since it "uses the permissive term 'should,'" and that the one occasion when SSR 06-03p requires an ALJ to explain the weight given to an opinion from an "other source" is "the rare instance where an ALJ gives greater weight to an opinion from an 'other source' over the medical opinion of a treating physician."

The Court agrees with the distinction made in *Hickox* that the word "should" does not create a mandatory duty with which the ALJ must comply (2010 WL 3385528, at *7), but he also must follow Sixth Circuit precedent from *Cruse*, which "strongly" suggests that an ALJ explain the weight that he assigns to the opinion of an "other source" when that opinion "may have an effect on the outcome of the case." 502 F.3d at 541. *Cruse* provides that an ALJ should apply the factors in SSR 06-03p when discussing "other source" opinions so "some basis" is given for why that opinion is rejected. *Id. Cruse* does not flesh out the extent to which an ALJ should discuss the factors in SSR 06-03p. However, given that SSR 06-03p distinguishes "acceptable medical sources" from "other sources" by noting that only "acceptable medical sources" can be treating sources, it logically follows that the heightened specificity required of an ALJ in explaining his application of the treating physician rule and in his analysis of the factors set forth in 20 C.F.R. 404.1527(d)[18] is

---

Recommendation. The plaintiff was allowed 14 days to file his objections to the Magistrate Judge's Report and Recommendation and after reviewing the plaintiff's objections, the District Court entered another order adopting the Magistrate Judge's Report and Recommendation. *See Hickox v. Comm'r of Soc. Sec.*, 2011 WL 6000829, at *4-5 (W.D. Mich. Nov. 30, 2011).

[18] The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Cole*, 661 F.3d at 937 (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5), and so that the plaintiff understands the disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

not required when analyzing "other source" opinions. *See also Stigall*, 2011 WL 65886, at \*5 ("the opinions of the LPCA . . . were not required to be considered in the same light as the opinion of a treating physician, and the ALJ was under no compulsion to provide 'good reason' for discounting them.").

In this case, the ALJ assigned little weight to Mr. Herman's psychological evaluation "because it arrives at a conclusion of severity that is inconsistent with the overall medical evidence as a whole and is not supported by the overall medical record." (Tr. 20-21.) The ALJ complied with SSR 06-03p and with *Cruse* by relying on the factors of inconsistency and supportability, which afforded the plaintiff the requisite reasoning as to why the ALJ assigned Mr. Herman's psychological evaluation little weight. Therefore, the ALJ properly evaluated Mr. Herman's psychological evaluation.

### 2. The ALJ did not err in analyzing the credibility of the plaintiff's subjective complaints of pain.

The plaintiff contends that the ALJ erred in evaluating the credibility of his subjective complaints of pain and "in making a conclusory credibility finding." Docket Entry No. 16, at 10. Specifically, the plaintiff argues that, while the ALJ made reference to 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), he "did not fully discuss the relevant factors or apply them to the facts of this case." *Id.* at 12.

In evaluating the plaintiff's credibility, the ALJ found that

the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the

extent they are inconsistent with the above residual functional capacity assessment. The treatment notes, examination findings and objective diagnostic testing results simply do not support the degree of limitation that the claimant alleges. In addition, there are a number of inconsistencies which detract from the claimant's credibility. The claimant alleges that he cannot work because he does not like to be around people, yet the evidence of record indicated that the claimant likes to spend time with a few of his good friends. The claimant's self reports of past and especially more recent alcohol use and abuse were not credible. In one recent treatment session in 2009 the claimant reportedly had alcohol on his breath. The claimant at times can become depressed and be given a fairly low GAF score, but when he is compliant with his medications and treatments and when he is not abusing alcohol as much, the record indicated that the claimant would score GAF scores consistent with moderate mental impairment symptoms. Despite having fairly few physical limitations, the claimant has a poor work history and last made a substantial effort to work in 2002. The fact that the claimant's mental impairments are moderate in severity does not support the claimant's allegation of disability and leads instead to a conclusion of possible dereliction of responsibilities. Finally, the overall medical evidence of record points to the claimant having made improvements in his mental condition when he is not abusing substances and is receiving regular psychological treatment and psychotropic medications for his mental impairments.

(Tr. 20.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole,

including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[19] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

---

[19] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

In this case, the ALJ concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," thus satisfying the first prong of the *Duncan* test.[20] (Tr. 20.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[21]

In making his credibility determination, the ALJ relied on the medical records from examining and nonexamining sources and on the effectiveness of the plaintiff's medication. (Tr. 20.) First, the ALJ's determination that the plaintiff's mental impairments are moderate in severity is

---

[20] The Court will focus on the plaintiff's mental impairments in evaluating the credibility of his subjective complaints of pain since the plaintiff contends that his "bipolar condition with psychotic features" satisfies the first prong of the *Duncan* test. Docket Entry No. 16, at 12.

[21] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

supported by Dr. VanderPlate's PRTF and mental RFC and by a CRG assessment. (Tr. 243-56, 257-58, 280-81.)  In his PRTF, Dr. VanderPlate indicated that the plaintiff had moderate restriction of activities of daily living; moderate difficulties maintaining social functioning, concentration, persistence, or pace; and one or two episodes of decompensation (tr. 253) and he opined that the plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; in his "ability to maintain attention and concentration for extended periods;" in his "ability to work in coordination with or proximity to others without being distracted by them;" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in his "ability to interact appropriately with the general public;" in his "ability to accept instructions and respond appropriately to criticism from supervisors;" in his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and in his "ability to respond appropriately to changes in the work setting." (Tr. 257-58.)

Next, the ALJ found that the plaintiff's mental impairments can be controlled when he "is compliant with his medications" and receives "regular psychological treatment." (Tr. 20.)  The plaintiff related to VBHCS that Celexa and Xanax "worked good for six years" and that Lithium keeps him "level headed-I don't go up and down as much," and he reported that when he took his medication he did "well," was "good," felt "fine;" "his mood has been good and stable;" and "he had no problems or [symptoms] of Axis I pathology." (Tr. 266, 369, 373, 377.)  Additionally, MHMR records indicated that when the plaintiff took his medication he was able to "function" and was "somewhat improved" and records from both MHMR and VBHCS indicated that he was "doing well." (Tr. 266, 361, 377, 390.)

In sum, the medical records from examining and nonexamining sources and the effectiveness of the plaintiff's medication demonstrates that his impairments cause him a certain amount of pain, but that same record medical evidence does not support his subjective complaints that his pain is disabling.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge